UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


RONALD D. MELL, SR., et al.,     :     NO: 1:08-CV-00715
                                 :
        Plaintiffs,              :
                                 :     **OPINION AND ORDER**
             v.                  :
                                 :
ANTHEM, INC., et al.,            :
                                 :
        Defendants.              :


        This matter is before the Court on the cross motions of

the parties: The Wellpoint Defendants' Motion for Summary Judgment

(doc. 32), Plaintiffs' Response in Opposition (doc. 47), and

Defendants' Reply (doc. 50); Plaintiffs' Motions for Partial

Summary Judgment on Liability (docs. 33, 36), The City of

Cincinnati's Response in Opposition (doc. 45), The Wellpoint

Defendants' Response in Opposition (doc. 46), and Plaintiffs' Reply

(doc. 52); and the City of Cincinnati's Motion for Summary Judgment

(doc. 37), Plaintiffs' Response (doc. 48), and the City's Reply

(doc. 51).  The Court held a hearing on these matters on November

4, 2009, after which it found it appropriate to order supplemental

discovery.  The Court held a second hearing, on February 25, 2010,

at which time it considered the outcome of such discovery, as well

as the arguments of the parties as to Defendants' Motion to Certify

Question to the Supreme Court of Ohio (doc. 87) and Plaintiffs'

Response in Opposition (doc. 89).

        For the reasons indicated herein, the Court GRANTS the

Wellpoint Defendants' motion for summary judgment, DENIES the Plaintiffs' motions, GRANTS IN PART AND DENIES IN PART the City's motion, and DENIES Defendants' motion to certify as MOOT.

## I.  General Background

This case involves Plaintiffs' claims that they were cheated out of proceeds as insureds, when Defendant Anthem Insurance ("Anthem") demutualized in 2001 and issued 870,021 shares of stock to the City of Cincinnati ("the City"), Plaintiffs' employer, instead of to Plaintiff policy holders (doc. 1).  The City ultimately sold the stock for approximately $55 million, the amount Plaintiffs seek to recover in this action (<u>Id</u>.).  Plaintiffs allege they are a class of 2,460 individuals named as insured persons, or who were members of a group of insured persons covered under the Group Policy during the relevant time period (<u>Id</u>.).  In addition to Anthem and the City, Plaintiffs name as Defendants Anthem, Inc. (n/k/a "Wellpoint Inc."), the parent corporation of both Defendant Anthem Insurance and its subsidiary, Defendant Community Insurance Company ("CIC").  Plaintiffs assert numerous state common law claims in diversity for breaches of multiple contracts, conversion, and misappropriation, aiding and abetting conversion and misappropriation, breach of fiduciary duties, breach of agency agreement and fraudulent concealment, and seek compensatory damages and other relief (<u>Id</u>.).

On November 4, 2009, the Court conditionally certified

this matter as a class action encompassing employees and retirees of the City who were named insureds or members of groups named as insureds, insured continuously from June 18, 2001, to November 2, 2001 (doc. 53). The class includes two subsets, 1) "Class A," those who had insurance prior to the merger between Community Mutual Insurance Company ("CMIC") and Anthem in 1995, and 2) "Class B," those who received insurance post-merger (Id.).

The parties filed cross motions for summary judgment (docs. 32, 33, 36, 37), all asserting there are no genuine issues of fact in dispute, while taking diametrically opposing views of how the law applies to this case. Essentially, Plaintiffs argue Ohio law entitles Class A members to demutualization proceeds. They premise their argument on the definition section in the Ohio demutualization statute, Ohio Rev. Code § 3913.20(B), which defines the person "named as the insured," as the policyholder. They contend under the law the policyholder is entitled to demutualization proceeds. Plaintiffs argue they are the persons named as the insureds and therefore they were entitled to the demutualization proceeds as policyholders under Ohio law. Plaintiffs further argue that Class B members are entitled to proceeds based on express terms in the merger agreement, and, at least originally, based on a certificate in the possession of one of the class representatives. Defendants argue Ohio demutualization law does not apply, and even if it does, that

Plaintiffs misinterpret such law.  Defendants contend there is no dispute the City owned the group policy, and as such, even if Ohio law applies, the City appropriately took the proceeds of the demutualization.  Defendants further argue the Plaintiffs incorrectly assert claims for Class B members, because there was never a requisite break in insurance coverage to trigger the rights they assert.  Finally, Defendants contend the document Plaintiff Schenck (o/b/o Wilmes) proffers proves nothing as it does not identify the insured and contains no information tying it to the City's retiree benefit plan.  At the February 25, 2010 hearing, it appears that all parties agreed the Schenck document, and the few others unearthed in discovery, do not serve to establish rights of Class B members.[1]

## II. The Summary Judgment Standard

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

[1]Counsel for Plaintiff stated, "The rights in Group B. . .to demutualization compensation when Anthem demutualized, are similarly not dependent on any of the documents that were produced in the supplemental discovery."  Moreover, Plaintiffs stated in their Reply to Defendants' Responses to Plaintiffs' Motion to Approve Notice to Non-Class Members, "These documents [the Summary of Benefits form and the Certificate of Membership form] do not provide the legal entitlement to demutualization compensation; they merely demonstrate which path to demutualization compensation the worker is entitled." (doc. 82).

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464 (1962); <u>LaPointe v. United Autoworkers Local 600</u>, 8 F.3d 376, 378 (6th Cir. 1993); <u>Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs.</u>, 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Fatton v. Bearden</u>, 8 F.3d. 343, 346 (6th Cir. 1993), <u>quoting</u> <u>in</u> <u>part</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 251-252 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact [.]" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see</u> <u>also</u> <u>LaPointe</u>, 8 F.3d at 378; <u>Garino v. Brookfield Township Trustees</u>, 980 F.2d 399, 405 (6th Cir. 1982); <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the

5

non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel, Shaeffer & Ebeling Co. L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. at 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-248 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip

6

<u>Morris Cos., Inc.</u>, 8 F.3d 335, 339-340 (6th Cir. 1993); <u>see also</u> <u>Celotex</u>, 477 U.S. at 324; <u>Guarino</u>, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." <u>Guarino</u>, 980 F.2d at 405, <u>quoting</u> <u>Inter-Royal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. <u>See</u> <u>McDonald v. Union Camp Corp.</u>, 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970); <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. <u>See</u> <u>Adams v. Metiva</u>, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. <u>See</u> <u>Matsushita</u>, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. <u>See</u>

7

<u>Guarino</u>, 980 F.2d at 410; <u>Carver v. Bunch</u>, 946 F.2d 451, 454-455 (6th Cir. 1991).

## III.   Mutual Companies and Demutualization

The insurance industry is organized under two basic corporate structures: stock and mutual.   In general, mutual insurance exists where several persons have joined together for their united protection, each member contributing to a fund for the payment of losses and expenses.[2]  Generally speaking, each member is both an insurer and an insured, and the mutual company is owned and controlled by its policyholders.[3]   Most mutual insurers are incorporated under state laws that establish provisions for such entities.[4]

Stock insurance companies, by contrast, are owned by their shareholders, and their purpose is primarily to earn profit for their shareholders.[5]   Stock companies can issue stock and therefore possess the ability to increase their reserves and

---

[2] Lee R. Rust and Thomas F. Segalla, <u>Couch on Insurance 3D</u>, §39.15 (1995).

[3] <u>Id</u>.

[4] Robert E. Keeton and Alan I. Widiss, <u>Insurance Law: A Guide to Fundamental Principles, Legal Doctrines and Commercial Practices</u>, § 2.1(a)(3) (1988).

[5] John Alan Appleman, <u>18 Insurance Law and Practice</u>, Ch. 344, § 10041 (1945).

surplus beyond what mutual companies can generate internally.[6] For this primary reason, among others, there has been a strong trend of mutual companies changing their corporate structure to stock companies, through a process called demutualization.[7]

The demutualization process involves a variety of professional disciplines and legal issues, and requires expert actuarial, legal, and accounting advice.[8] The process of demutualizing requires preparing and printing substantial information to policyholders.[9] The mutual must make a determination, based on the company's by-laws, articles of

---

[6] James A. Smallenberger, Insurance Law Annual: Restructuring Mutual Life Insurance Companies, 49 Drake L. Rev. 513 (2001). Naturally, restructuring implicates other issues, as the company must also be prepared to deal with consequences of a new corporate structure including proxy solicitations, periodic shareholder reports, and the risks of proxy contests and takeover threats. Gordon O. Pehrson, Jr., David R. Woodward, and James H. Mann, Demutualization of Insurance Companies: A Comparative Analysis of Issues and Techniques, 27 Tort & Ins. L.J. 709 (1992).

[7] Id. Since the 1930's over 200 mutual companies converted to stock companies. Couch on Insurance 3D, § 39:43. From 1996 to 2001, twenty-eight mutual life insurance companies either completed or announced plans to reorganize into a different corporate structure. Smallenberger, 517. By the end of 1999, only 106 out of 1470 life insurance companies in the United States were mutual companies. Id.

[8] Gordon O. Pehrson, Jr., David R. Woodward, and James H. Mann, Demutualization of Insurance Companies: A Comparative Analysis of Issues and Techniques, 27 Tort & Ins. L.J. 709 (1992).

[9] Id.

incorporation, and applicable law, as to which policyholders are entitled to vote on the demutualization and receive consideration.[10]   Moreover, in the context of group policies, the mutual must determine who the owner is, the employer or the individual insureds.[11]

In Ohio, the conversion of mutual companies to stock companies is governed by Ohio Revised Code §§ 3913.10 to 3913.23. The provisions are divided such that the initial sections pertain to the conversion of mutual life insurance policies, while the latter sections pertain to non-life insurance policies.  Section 3913.21 sets out a detailed procedure by which a mutual company can convert to a stock company.[12]  The rights of mutual policy holders

_____

[10] Smallenberger, 532.

[11] Id., 533.

[12]

The process involves filing a resolution adopted by majority vote, along with financial statements and other documentation, with the Ohio superintendent of insurance.  The superintendent, after a review of the documents, if satisfied that the proposed conversion is not contrary to law, must order an examination of the company, after which the superintendent should appoint an appraisal committee.  The committee makes a determination of value of the company and determines the number of shares of the new corporation. Within sixty days of such determination, the policyholders, who must have thirty days notice, are called to a meeting to vote on the proposed conversion.  If a majority favors conversion, then the superintendent sets a hearing, providing thirty days notice to all policyholders and notice by publication in a newspaper of the county where the home office of the company is located.  If after the hearing, the superintendent is satisfied the conversion is proper, he shall issue an order accepting the report of the appraisal committee and authorizing the conversion.  After such order issues, the new articles of incorporation of the new

10

are set out in Section 3913.22.  Each mutual policyholder is entitled to such shares of stock in the new corporation as his or her portion of equitable value of the mutual company will purchase. Ohio Rev. Code § 3913.22.  "Shares shall be issued to the owner or owners of a mutual policy in force on the date of the examination. . . . as such owner or owners appear on the face of the policy." Id. at § 3913.22(C).  In an earlier definitional section, which Plaintiffs rely on in this case, the Ohio statute also states "'Policyholder' means the person, group of persons, association, corporation, partnership, or other entity named as the insured under a mutual policy of insurance. . ." Id. at § 3913.20.[13]  As such, the Ohio demutualization statute uses both the terms "owner" and "policyholder," in relation to demutualization proceeds.

## IV.  The Record

The factual background, as taken from the record, is as follows.  In February 1986 the City entered into a Master Contract
_____
corporation shall by filed with the secretary of state.

[13] Indiana has a similar statutory scheme authorizing and regulating the process of demutualization.  Ind. Code Ann. § 27-15-1-1 et seq.  Instead of using the terms "policyholder," "owner" or "insured," Indiana uses the term "member," and defines members to be a person that according to the records, articles of incorporation, and bylaws, is a member of the converting mutual. Ind. Code Ann. § 27-15-1-9.  Members are given "interests" in voting rights, as provided by law and by the company's articles of incorporation and bylaws, as well as rights to receive cash, stock, or other consideration in the event of a conversion to a stock insurance company.  Ind. Code Ann. § 27-15-1-10.

with Community Mutual Insurance Company ("CMIC") to provide Blue Cross/Blue Shield medical and hospitalization coverage for its employees, in addition to dental coverage for City firefighters. CMIC, an Ohio mutual insurance company, had bylaws in place stating that each policy holder of the company is a member, but then more specifically stated that "[i]n the case of a master contract for group insurance, the member shall be the holder of the master policy, and the holder of any certificate or contract issued subordinate to such master policy shall not be a member unless it makes specific provision for such membership."

In October 1995 CMIC merged with an Indiana company, Associated Insurance Companies ("AIC"), a predecessor of the Wellpoint Defendants. The merger was governed by Ohio Revised Code § 3941.35 et seq., which requires the merging entities to seek approval from their members and to file an agreement with the state superintendent of insurance to petition for approval of the merger. In their Joint Petition, CMIC and AIC stated that group policyholders are members and "[t]he holders of certificates of benefits issued under CMIC's group policies are not members of CMIC, are not entitled to vote and do not have proprietary rights in CMIC." The Ohio superintendent of insurance queried whether the certificate holders under CMIC's group contracts, rather than the employers, would receive guaranty policies/membership certificates, and thus become members of AIC. In response, CMIC stated the

12

terms of the guaranty policies would provide that "the group policyholders (e.g., the employers), not the certificate holders (e.g. the employees), are the members. . .and will have equity rights. . ." The superintendent ultimately approved the merger in all respects. As a result of the merger, CMIC ceased to exist, and its members became insured by Community Insurance Company ("CIC"), a subsidiary of AIC. Although CMIC disappeared, the merger documents provided that the former CMIC members would retain their rights under Ohio law, even though they were now members of an Indiana mutual insurance company. Soon after the merger, AIC changed its name to Anthem Insurance Companies, Inc. ("Anthem").

CMIC was not the only acquistion of AIC/Anthem. In the 1980's and 1990's it merged with numerous companies around the country to expand its geographic presence outside of Indiana. In 1993 AIC/Anthem acquired a Kentucky Blue Cross/Blue Shield licensee, Southeastern Mutual Insurance Company ("Southeastern") and in 1997 it merged with Blue Cross/Blue Shield of Connecticut (BC/BS-CT). As a result of these mergers, AIC/Anthem had diverse members with grandfathered rights based on the original entities' bylaws and on varying state laws. AIC/Anthem's original Indiana members, for example, were defined as the "enrollees" (the insureds); the group policyholders (the employers) were not.

In June 2001, the Board of Directors of AIC/Anthem approved a plan to demutualize, and submitted their proposal to the

Indiana Department of Insurance. The Indiana Department completed a review of the merger documents, CMIC bylaws, and the Ohio superintendent's approval of the merger, and then conducted a public hearing regarding the proposed conversion. Following the hearing, the Indiana Department approved the plan of conversion, issuing an Order stating that "individual certificate holders under group Policies issued to groups by Anthem Insurance's Kentucky, Ohio and Connecticut subsidiaries prior to its mergers with those former mutual companies are not Statutory Members (the group policyholders are Statutory Members)." The demutualization became effective on November 2, 2001, and Anthem issued 870,021 shares of its common stock to the City, as well as shares to others it considered members entitled to proceeds.[14]

---

[14] Anthem's demutualization has been no stranger to controversy. Kentucky retirees insured under a Kentucky State Retirement System plan sued claiming entitlement to $1.3 million shares of Anthem stock. Love, et al. v. Board of Trustees of the Kentucky Retirement System, et al., No. 02-CI-00122, (Franklin Circuit Court, Division II) May 27, 2004. Connecticut and Ohio employees did so as well. AFSCME et al. v. Andover, No. X01CV030182395S, 2004 WL 2829835, *1 (Conn. Sup. Nov. 3, 2004), Gold v. Rowland, No. CV02813759, 2006 WL 2808629, *1 (Conn. Sup. July 26, 2006), Greathouse v. City of East Liverpool, 159 Ohio App. 3d 251 (Ohio Ct. App. 2004), State of Ohio, ex rel. Teamsters Local Union No. 637 v. City of Marietta, 2005 Ohio 7108 (Ohio Ct. App. 2005). Even the Indiana insureds, who unlike the Ohio, Kentucky, and Connecticut insureds received demutualization proceeds, sued claiming they did not get their fair share. Ormond v. Anthem, No. 1:05-CV-1908-DFH-TAB, 2008 WL 906157, *1 (S.D. Ind. March 31, 2008).

**V.  The Parties' Arguments**

The Court has reviewed the briefing in this matter, which is extensive.  The Court further held hearings on November 4, 2009, and February 25, 2010, which served to boil this matter down to its core elements.  Those core elements, as the Court sees it, are 1) the issue of what law applies and what that law means 2) the issue of whether new rights were triggered under the merger document, and 3) the significance of the Schenck document and the others like it.

Defendants argued first that the City was the policyholder and member of the mutual by virtue of the CMIC by-laws, that regulators specifically addressed such question in the 1995 merger, and the insureds received what they were entitled to: insurance.  In Defendants' view, Ohio demutualization law does not even apply to this case, because when Anthem demutualized in 2001, it was an Indiana company and the process was governed by Indiana law.

The Court queried whether the Plaintiffs would have been entitled to demutualization proceeds in 1994, had CMIC demutualized in Ohio.  Defendants took the position that Plaintiffs would not have been entitled to such proceeds, as Ohio demutualization law authorizes and directs that such proceeds go to the owner of the policy.  As there is no dispute that the City owned the policy, Defendants contend it would have been entitled to the proceeds.

Looking at the exact same documents, Plaintiffs arrive at

the opposite legal conclusion. Plaintiffs responded that in their view, had CMIC demutualized before the merger, under Ohio law, the City workers would have been entitled to demutualization proceeds. In Plaintiffs' view, the CMIC bylaws conflict with Ohio law when it comes to demutualization. Under Ohio law, argue Plaintiffs, "policyholder" is defined as the person "named as the insured," which would be the employee, and not the City. Ohio demutualization law applies, contend Plaintiffs, because the rights and interests of CMIC members were frozen in time based on the merger agreement. Under Ohio law, Plaintiffs contend, "policyholders" are entitled to demutualization proceeds.

The parties also addressed the issue of the "Class B" Plaintiffs. These Plaintiffs assert rights based on the merger document. As Plaintiffs see it, any new insurance issued after the merger would trigger equity rights for employees.[15] Plaintiffs contend that a human organ transplant rider ("HOT rider") added in 1998 did just that. Moreover, at the November hearing, Plaintiffs proffered a certificate of membership held by Plaintiff Schenck that states "As long as the guarantee policy is in effect, you'll be a member of Associated, entitled to all rights of membership in Associated accorded to members of a mutual insurance company under

---

[15]Plaintiffs premise their theory regarding the new insurance "trigger" on an unexecuted boilerplate form entitled "Group Policy for Future Community Contract Holders" (doc. 31-21), which Defendants contend the City never possessed.

the Indiana Insurance Law. . .including. . .equity rights in the event of. . .demutualization." Plaintiffs argued this certificate, dated October 1995, evidences new coverage issued post-merger, and on its face shows Plaintiffs have equity rights.

Defendants responded that the merger documents provide that there must be a break in coverage in order to trigger equity rights for the employees.  In their view, so long as the original master contract was renewed, amended or replaced, without a lapse in coverage, the City retained its status as "member" post-merger. At the November hearing, Defendants further contended the Schenck document "makes no sense at all," all the other documentary evidence is inconsistent, and no other employee or retiree from the City has come forward with a similar document.

Plaintiffs replied at the November hearing that no other employee had come forward with a document like Schenck's document because the Defendants refused to provide a list of class members until the Court would certify this matter as a class action.  As such, Plaintiffs contended at they did not have the opportunity to survey the class to see if others had such a document.  For this reason, the Court ordered discovery on the question, so as to leave no stone unturned, and set the issue of the significance of the Schenck document, and any others like it, for the second hearing on February 25, 2010 (docs. 58, 62, 85).

At the November hearing, the City also proffered a copy

of its "Group Guaranty Health Policy and Certificate of Membership," on its face dated "Rev. 4/97," which explicitly states that enrollees or covered persons shall not "receive any equity rights by virtue of being an Enrollee." Because Plaintiffs are saying they are a third-party beneficiary to the Guaranty Policy, the City argued the very terms of such policy preclude Plaintiffs from claiming demutualization proceeds, and such claims should fail.

A final matter addressed at the November hearing was the question of the statute of limitations. Plaintiffs filed their Complaint in October 2008. Plaintiffs contend that as to their contract claims, the applicable statute is fifteen years, and so there is no statute of limitations issue as to such claims. As for their tort claims, Plaintiffs contend a four-year statute of limitations applies, but even if the City is correct that a two-year limitations period applies, they timely filed their Complaint because they discovered their claims in December 2007 and in April of 2008.

Defendants argue the discovery rule does not apply to toll the statute of limitations because the 2001 demutualization and relevant transactions were public facts about which Plaintiffs undoubtedly were aware. In Defendants' view, constructive knowledge of facts, rather than their legal significance, is enough to start the statute of limitations running. Here, Defendants

contend, Plaintiffs claim to have "discovered" their injuries after they were contacted by a lawyer. Such a "discovery," Defendants claim, should not allow Plaintiffs to circumvent the statute of limitations.

**VI. Analysis**

Having reviewed this matter, the Court finds that Plaintiffs' theory as to Class A members is predicated on the view that Ohio law categorically excludes a group policy holder from possessing equity rights in a mutual insurance company. Under this view, CMIC's bylaws were ultra vires, and in conflict with Ohio law, which would require that employees automatically gain equity rights when provided insurance through a mutual company.

The two Ohio demutualization cases cited by the parties Greathouse v. City of East Liverpool, 159 Ohio App. 3d 251 (Ohio Ct. App. 2004), and State of Ohio, ex rel. Teamsters Local Union No. 637 v. City of Marietta, 2005 Ohio 7108 (Ohio Ct. App. 2005) cast some light on whether Plaintiffs' view is correct. Only Greathouse made a determination of who was entitled to demutualization proceeds, and the decision was predicated on the determination that the employer owned the insurance policy. The state appellate court found that because "the City, not appellant, contracted with Anthem and owned the policy, appellant was not entitled to the stock proceeds. As a benefit of his employment, the City provided appellant with health insurance–nothing more.

Appellant cannot contend that he somehow owned the policy and was entitled to the stock proceeds." Such decision is not inconsistent with Ohio Revised Code § 3913.22(C) which states that in a demutualization "[s]hares shall be issued to the owner or owners of a mutual policy. . .as such owners appear on the face of the policy."

Although the court in <u>State of Ohio, ex rel. Teamsters Local Union No. 637</u> found the reasoning of the <u>Greathouse</u> court "sound," it expressly declined to decide the issue of who owned the policy because of the different procedural postures of the cases. <u>Greathouse</u> involved an appeal from summary judgment, whereas the <u>State of Ohio, ex rel. Teamsters Local Union No. 637</u> case involved an appeal from a Ohio R. Civ. P. 12(B)(6) dismissal. 2005 Ohio 7108, *P12-14.[16]

---

[16]In <u>State of Ohio, ex rel. Teamsters Local Union No. 637 v. City of Marietta</u>, the appellant union and employees had claimed they were entitled to demutualization proceeds instead of the City of Marietta. 2005 Ohio 7108. The City filed a motion to dismiss pursuant to Rule 12(b)(6), which the Washington County Court of Common Pleas granted. <u>Id</u>. Appellants challenged such ruling on appeal, contending they had alleged in their complaint that the insurer historically provided in its articles of incorporation and/or bylaws that employees under a group health insurance plan were the policyholders or owners of the plan. <u>Id</u>. The Ohio Court of Appeals reasoned that it had to accept such allegation as true for purposes of evaluating the City's motion to dismiss, and could not look beyond the complaint to evaluate the allegation. <u>Id</u>. The Court reversed the trial court's judgment and remanded the matter for further proceedings. <u>Id</u>. The Court noted that the question of whether appellants were in fact owners of the health insurance policies was an issue to be explored in further detail on summary judgment, as was presumably done in <u>Greathouse</u>. The instant case, too, obviously is in a

In its analysis the state appeals court found the allegation that the bylaws granted equity rights to the plaintiffs precluded the granting of a motion to dismiss. 2005 Ohio 7108 at *P13. However, the Court made no finding that Ohio law categorically excludes the possibility that an employer could possess the equity rights in a mutual insurance company. Indeed, the very fact that the Court remanded the matter for further proceedings concerning the issue of who owned the policy shows the state court of appeals did not read Ohio law to automatically grant equity rights to insured employees.

Plaintiffs argue the definition section in Ohio Revised Code § 3913.20 makes them the "policyholder" because they were "named as the insured under a mutual policy." Putting aside the fact that the Court has no policy before it naming any of the Plaintiffs as insured, the Court finds no question that Plaintiffs

---

different procedural posture as the Court has the CMIC bylaws before it, and not mere allegations. The CMIC bylaws specifically state that "In the case of a master contract for group insurance, the member shall be the holder of the master policy, and the holder of any certificate or contract issued subordinate to such master policy shall not be a member unless it makes such provision for such membership." The bylaws then give members (the City here) rights as are prescribed by law for members of mutual insurance companies organized under the laws of Ohio, by the Articles of [CMIC], the regulations and bylaws, and any policy of insurance issued by CMIC and held by the member (doc. 32-2, Ex. A). The group policy the City held, moreover, explicitly states "No Enrollee [insured employee]. . .shall receive any equity rights by virtue of being an Enrollee." (doc. 46-3).

were insured by the City's contract with CMIC for group coverage. There appear to be competing authorities on the question of whether insureds in a group policy context are automatically considered "policyholders." At the February 25, 2010 hearing, Plaintiffs' Counsel cited the Ohio Health Insurance Guide, Couch on Insurance, and Anthem's own documents for the proposition that in a group policy those "named as insured" are policyholders. However, the portion of the Ohio Revised Code pertaining to group sickness and accident insurance, Ohio Revised Code § 3923.12(2), appears to define the policyholder in group insurance contexts as the employer. Finally, Plaintiffs' Complaint indicates there is no dispute the City owned the policy, and states it may have been deemed a "policyholder" for other purposes, including voting, but contends the City was not a policyholder within the meaning of the demutualization statute.

The Court notes that Section 3913.22, which delineates the "Rights of Mutual Policyholders" in a demutualization, uses both the terms policyholder and owner. The term, "policyholder" is defined in section 3913.20, while the term "owner" is not defined. Under the plain meaning rule of statutory construction, the word "owner" can be presumed to be used in its ordinary sense. Caminetti v. United States, 242 U.S. 470, 485-486 (1917)("Statutory words are uniformly presumed, unless the contrary appears, to be used in their ordinary and usual sense, and with the meaning

commonly attributed to them.")  Here, even if Plaintiffs'
interpretation is correct that they are "policyholders" under the
definition in section 3913.20, there is no dispute: they certainly
were not owners.  Section 3913.22 states the "shares shall be
issued to the owner or owners."[17]  Section 3913.22 specifically
addresses who is ultimately entitled to demutualization shares.
Effect should be given to every clause and part of a statute, with
specific terms prevailing over the more general which otherwise
might be controlling.  D. Ginsberg & Sons, Inc. v. Popkin, 285 U.S.
204, 208 (1932).  Here, should the Court interpret the Ohio statute
to only allow insureds to possess equity rights in demutualization
proceeds, such interpretation would give no effect to the express
specific terms of section 3919.22(C) which the Court understands
gives "owners" such right.  A better reading of the statute, in
the Court's view, is that as a general rule, "policyholders" are
the insureds, who are typically "owners" and entitled to proceeds.
However in some specific situations, like the one at bar where the
City is indisputably the owner of the group policy, the insureds do
not necessarily have equity rights.

    The Court does not believe the legislature intended to

---

[17]Plaintiffs read this section to mean that the owner in a
group policy context is issued the demutualization proceeds by
the insurance company, and then is charged to distribute the
proceeds to the insureds.  The Court finds Plaintiffs are reading
more into the statute than what it says on its face, and opts for
traditional statutory construction instead.

automatically grant employees in the group insurance context equity rights by the simple happenstance of the corporate structure of the mutual insurance company with whom their employer contracted. Nor does the Court believe the legislature intended to prohibit an employer from owning a group policy. The Plaintiffs here had nothing to do with the choice of insurance carrier, nor with its governance, and they received what they bargained with the City to get: insurance coverage. The employees were not so concerned about what insurance entity provided their coverage, or what legal form such entity took, but rather whether the benefits they had been promised by the employer would be available. There is no evidence in this case the employees were ever denied the benefits they were promised, when the insurer was a mutual or later a stock company.[18]

The Court's conclusion is consistent with the limited Ohio authority on the subject, but also with the Ohio insurance superintendent's approval of the 1995 merger, and with the Indiana

_____

[18] From the Court's point of view, unless the terms of the policies or the state law governing insurance have clearly and unqualifiedly stated the employees were entitled to demutualization proceeds, then the Plaintiffs carry a heavy burden to upend the determination that they are not so entitled. Here the Court finds no real question that the insurance policy and the law give equity rights to the employer. In the Court's mind, however, should there be any doubts in this regard, such doubts should be resolved in favor of the employer because the employees, under their compensation package, have never been denied insurance coverage provided for in their insurance agreements. They got what they bargained for.

Department of Insurance's approval of the demutualization.[19]  Having thus concluded, the Court finds Plaintiffs' interpretation of Ohio law incorrect, and therefore finds that Defendants prevail on their motion for summary judgment as to the Class A Plaintiffs.  The City was a legitimate member of CMIC, and after the merger, the City possessed grandfathered rights as a member of the Indiana mutual insurance company.  The Indiana demutualization, which took account of the City's rights as a member of CMIC pre-merger, therefore properly awarded the demutualization proceeds to the City.

As for Class B members, the Court further finds Plaintiffs' interpretation of the merger document incorrect. Plaintiffs frame the "triggering event," that would provide equity rights to Class B Plaintiffs, as the issuance of new insurance.  No doubt, the issuing of new riders to the underlying policy could be viewed as new insurance.  However the merger document does not state that new insurance is the "triggering event."  It states:

> The Associated guaranty insurance policy/membership certificate shall continue in effect as long as (a) the insurance policy or health care benefits contract assumed by CIC pursuant to Clause (A) of this Section 3.1 is in effect, or has been renewed, amended, or replaced, without a lapse in coverage, by any CIC insurance policy or health care benefits contract and (b) the membership fees required. . .are paid when due. . .

---

[19]The Court notes that the regulatory actions by state agencies are entitled to deference, and that the Ohio superintendent was required under law, Ohio Revised Code § 3941.38(B)(2), to ensure the protection of the equity rights of the members.  The Court believes the superintendent did so.

The Court's reading of this provision is that the guaranty stays in effect so long as there is no lapse in coverage. The Court finds there has been no lapse in coverage in this case. The City has continually maintained its Group Guaranty Health Policy. For this reason, the Court rejects the theory that those Class B "newly-insureds" with human organ transplant coverage gained equity rights.

Finally, the Court finds the existence of the Schenck document proves nothing. First, it cannot serve, as Plaintiffs first claimed, as the evidence of "new insurance" triggering a change in equity rights for the reason articulated above-- there was no lapse in coverage. Second, the certificate was issued subordinate to the Group Guaranty Policy. The only Group Guaranty Policy in the record, although on its face apparently post-dating the Schenck document, expressly contradicts it. Under both Ohio and Indiana law the terms and conditions of an insurance policy trump any terms listed in the certificate of coverage. <u>Talley v. Teamsters, Chauffeurs, Warehousemen, and Helpers, Local No. 377</u>, 357 N.E.2d 44, 46-47 (Ohio 1976)("It is generally held tha the certificate of coverage merely evidences the employee-member's right to participate in the insurance provided under the terms and conditions imposed in the group policy. Consequently, the provisions of the group policy are controlling over the provisions in the certificate, and the rights of the parties in a group

insurance enterprise are dependent upon the group contract."),
American Family Insurance Co. v. Globe American Casualty Co., 774
N.E.2d 932, 939 (Ct. App. Indiana, 2002)(the insurance certificate
evidences that insurance has been obtained but in itself does not
constitute a policy, nor can its terms contradict the terms of the
policy).   Third, the Schenck document fails to name who the
"member" is or to identify specifically what group policy it
relates to.  Finally, at the February 25, 2010 hearing, it became
clear that discovery only yielded a confusing result in that Class
A Plaintiffs possessed documents one would presume would be found
in the possession of Class B Plaintiffs, and vice-versa.  Although
the Court expressed its dismay at Defendants' position that Athem
issued the documents by mistake, it appears the documents are
simply legally irrelevant here.  Under these circumstances, and in
the light of the overwhelming record evidence to the contrary, the
Court cannot find that the Schenck document or those similar to it
salvage any of Plaintiffs' claims to demutualization proceeds.

Because the Court has visited the core issues at stake
and concluded Defendants are entitled to summary judgment, it need
not devote substantial attention to the other arguments raised by
Defendants, which as it has indicated before, it considers as
affirmative defenses.  However, the Court does find it appropriate
to indicate that it finds that Plaintiffs have alleged both
contract and tort claims, but that in its view, this case sounds in

tort, that is, in the various alleged breaches of fiduciary duty allegedly owed to Plaintiffs under Ohio demutualization law. There can be no contract claims, because the controlling group policy is between Anthem and the City, and such policy explicitly excludes enrollees (that is insured employees) from possessing equity rights in the mutual insurance company. The Court does not find such provision contrary to Ohio law. Moreover, Plaintiffs' Complaint alleged breaches of contract based on Schenck document, which as explained above, is trumped by the group policy as a matter of law.

The Court further disagrees with the City that it is entitled to immunity under Ohio Revised Code § 2744, because clearly, Plaintiffs' claims arise out of their employment relationship with the City. Ohio Revised Code § 2744.09. Finally, because Plaintiffs contend they were oblivious to their claims due to Defendants' alleged concealment and fraudulent misrepresentation, the Court finds the application of the discovery rule appropriate here, such that there is no issue of Plaintiffs' action being barred by the statute of limitations.[20] A reasonable person very well would not have known of his or her potential rights in the context of a demutualization, and moreover, the interests of justice here call for the Court to reach the merits of

_____

[20]Decedent Plaintiff Wilmes was the first to learn of her potential claims, in December 2007, Plaintiffs Espel and Matacia learned of their claims on April 3, 2008. Plaintiffs filed this action on October 15, 2008, within four years of discovery of their potential claims. Ohio Revised Code § 2305.09(C).

this matter, so as to bring clarity, and put it to rest.

## VII. Conclusion

The Court finds no genuine dispute of material fact and concludes that as a matter of law, the City, by express terms of the CMIC bylaws, was the party entitled to equity interests in mutual insurance policy that it contracted and owned. It concludes that the award of demutualization proceeds to the City did not violate Ohio law. Accordingly, the Court GRANTS The Wellpoint Defendants' Motion for Partial Summary Judgment (doc. 32), DENIES the Plaintiffs' Motions (docs. 33, 36), and DENIES IN PART the City's Motion as to its immunity and statute of limitations defenses (doc. 37), while GRANTS IN PART the City's Motion as to the legal determination that it was the eligible statutory member entitled to demutualization proceeds (doc. 37). Finally, the Court DENIES as MOOT the Joint Motion of Defendants to Certify Question to the Supreme Court of Ohio (doc. 87), and DENIES as MOOT Defendants' Joint Motion to Stay Pending Ruling on Petition for Permission to Appeal Order on Class Certification (doc. 56). The Court DISMISSES this matter from the docket.

SO ORDERED.

Dated: March 3, 2010      <u>s/S. Arthur Spiegel</u>

                                  S. Arthur Spiegel
                                  United States Senior District Judge